# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |  |
|---|---|---|
| ARSALAN ASHRAF, on behalf of himself and all others similarly situated, | : : : | Case No.: |
|  | : |  |
| Plaintiffs, | : : | **CLASS ACTION COMPLAINT** |
| vs. | : : |  |
| ENERGY TRANSFER PARTNERS, L.P., ENERGY TRANSFER PARTNERS GP, L.P., ENERGY TRANSFER PARTNERS, L.L.C., ENERGY TRANSFER EQUITY, L.P., KELCY L. WARREN, TED COLLINS, JR., MICHAEL K. GRIMM, MARSHALL S. McCREA, JAMES R. PERRY, MATTHEW S. RAMSEY, and DAVID K. SKIDMORE, | : : : : : : : : : : : | **JURY DEMAND** |
|  | : |  |
| Defendants. | : : |  |

Plaintiff, Arsalan Ashraf ("Plaintiff"), by his attorneys, on behalf of himself and those similarly situated, alleges upon personal knowledge as to his own acts and upon information and belief as to all other matters, based upon the investigation made by and through his attorneys, which investigation included, *inter alia*, the review of United States Securities and Exchange Commission ("SEC") filings, press releases, analyst reports, news articles and other materials, as follows:

## NATURE OF CASE

1.      Plaintiff brings this unitholder class action on behalf of himself and all other public unitholders of Energy Transfer Partners, L.P. ("ETP" or the "Partnership"), against ETP, ETP's general partner, Energy Transfer Partners GP, L.P. ("ETP GP"), ETP GP's general partner, Energy Transfer Partners, L.L.C. ("ETP LLC" and, collectively, ETP, ETP GP, and ETP LLC will be referred to as "ETP"), and ETP's Board of Directors (the "Individual Defendants" or the "Board"),

for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78n(a) and 78t(a), and Rules 14a-9, 17 C.F.R. §240.14a-9, promulgated thereunder ("Rule 14-9").

2.      On November 21, 2016, ETP and Sunoco Logistics Partners L.P. ("SXL") announced that they had entered into a definitive merger agreement (the "Merger Agreement")[1] pursuant to which SXL, through its wholly owned subsidiary SXL Acquisition Sub LP ("Merger Sub"), will acquire all outstanding shares of ETP for 1.5 common units of SXL for each common unit of ETP (the "Proposed Transaction"). Holders of ETP's Series A Cumulative Convertible Preferred Units will receive an equal number of SXL preferred units, with the same rights, preferences, privileges, duties and obligations that such Series A units had immediately prior to the closing of the merger, subject to certain adjustments in accordance with the ETP partnership agreement.

3.      The Proposed Transaction is the result of a single bidder process with no go-shop period or market check and which leaves ETP unitholders with entirely inadequate consideration for their ETP units.  The process was led by a conflicted Board and financial advisor looking to achieve financial windfalls for themselves all the while neglecting ETP unitholders' interests.

4.      In addition, in connection with the Proposed Transaction, on December 19, 2016, Defendants filed a Form S-4 Registration Statement ("Registration Statement") with the SEC that failed to make all material disclosures and contained materially misleading statements about the Proposed Transaction.  As explained below, the Registration Statement exposes some details regarding the highly flawed sales process, but fails to disclose a myriad of material facts

---

[1] Amendment No. 1 to the Merger Agreement was filed on December 16, 2016.  Amendment No.1 and the Merger Agreement are herein collectively referred to as the "Merger Agreement."

concerning the Proposed Transaction and provides unitholders with materially misleading information, thereby rendering unitholders unable to make an informed decision on whether to vote in favor of the Proposed Transaction.

5.      For these reasons, and as set forth herein, Plaintiff seeks to enjoin the Proposed Transaction, or, in the event the Proposed Transaction is consummated, recover damages under the Exchange Act.

## PARTIES

6.      Plaintiff is, and at all relevant times hereto has been, an ETP unitholder.

7.      Defendant ETP is a Delaware limited partnership, with its principal place of business at 8111 Westchester Drive, Suite 600, Dallas, TX 75225.

8.      Defendant ETP GP is a Delaware limited partnership and the general partner of ETP.

9.      Defendant ETP L.L.C. is the general partner of ETP GP.

10.     Defendant Energy Transfer Equity, L.P. ("ETE") is a Delaware limited partnership and indirect parent entity of ETP, ETP GP, SXL and SXL GP, with principal offices in Dallas, Texas.

11.     Defendant Kelcy L. Warren is Chief Executive Officer ("CEO") and Chairman of the Board of ETP and serves as Chairman of the board of directors of ETE.

12.     Defendant Ted Collins, Jr. is a member of the Board of ETP.

13.     Defendant Michael K. Grimm is a member of the Board of ETP.

14.     Defendant Marshall S. McCrea ("McCrea") is a member of the Board of ETP and has been Group Chief Operating Officer and Chief Commercial Officer for the Energy Transfer family since 2015.  McCrea previously served as President and Chief Operating Officer ("COO")

of ETP's general partner from June 2008 to November 2015 and President –Midstream from March 2007 to June 2008.  He also served as Senior Vice President – Commercial Development since January 2004, and was named President of La Grange Acquisition LP, ETP's primary operating subsidiary, in March 2005.  McCrea is also a member of the board of directors of ETE.  Further, McCrea serves on the board of directors of SXL and Sunoco LP.

15.     Defendant James R. Perry has served as a Director of the Company at all relevant times herein.  Perry resigned from the Board of ETP, ETP GP, and ETP LP on December 31, 2016.

16.     Defendant Matthew S. Ramsey ("Ramsey") is a member of the Board and has also served as a member of the board of directors of ETE.  Ramsey was named President and COO of ETP's general partner in November 2015. Further, Ramsey is a director of Sunoco L.P., serving as chairman of Sunoco L.P.'s board since April 2015.

17.     Defendant David K. Skidmore is a member of the Board.

18.     Defendants Warren, Collins, Grimm, McCrea, Perry, Ramsey, and Skidmore are collectively referred to herein as the "Individual Defendants."

19.     The Individual Defendants, ETP, ETP GP, Energy Transfer Partners, L.L.C. and ETE are referred to as "Defendants."

20.     Non-party SXL is a Delaware limited partnership with its principal place of business in Newtown Square, Pennsylvania.

21.     Non-party SXL GP is the general partner of SXL.

22.     Non-party Merger Sub is a Delaware limited liability company and a wholly owned subsidiary of SXL.

## JURISDICTION AND VENUE

23.     This Court has subject matter jurisdiction under Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. § 1331 (federal question jurisdiction), as this Complaint alleges violations of Rule 14(a).

24.     Venue is proper in this Court because the Defendants reside, are found, have agents and regularly transact business in this District as provided in 28 U.S.C. § 1391(b) and (c)

## SUBSTANTIVE ALLEGATIONS

*Background and ETP Success*

25.     ETP is a master limited partnership that owns and operates one of the largest and most diversified portfolios of energy assets in the United States. ETP's subsidiaries include Panhandle Eastern Pipe Line Company, LP (the successor of Southern Union Company) and Lone Star NGL LLC, which owns and operates natural gas liquids storage, fractionation and transportation assets. In total, ETP currently owns and operates approximately 62,500 miles of natural gas and natural gas liquids pipelines. ETP also owns the general partner, 100% of the incentive distribution rights, and 67.1 million common units of SXL, which operates a geographically diverse portfolio of complementary crude oil, refined products, and natural gas liquids pipeline, terminalling acquisition and marketing assets which are used to facilitate the purchase and sale of crude oil, natural gas liquids, and refined products.

26.     ETP had a successful year in 2016, completing certain acquisitions and reporting overall positive financial results.  For instance, on May 4, 2016, the Partnership announced first quarter financial results and summarized the Partnership's accomplishments as follows:

- In March 2016, ETP contributed to Sunoco LP its remaining 68.42% interest in Sunoco, LLC and 100% interest in the legacy Sunoco, Inc. retail business for $2.23 billion. Sunoco LP paid $2.20 billion in cash, including a working capital adjustment, and issued 5.7

million Sunoco LP common units to ETP Retail Holdings, LLC, a wholly-owned subsidiary of the Partnership. The transaction was effective January 1, 2016.

- In April 2016, Bayou Bridge Pipeline, LLC ("Bayou Bridge"), a joint venture among ETP, Sunoco Logistics Partners L.P. ("Sunoco Logistics") and Phillips 66 Partners LP, began commercial operations on the 30-inch segment of its pipeline from Nederland, Texas to Lake Charles, Louisiana. ETP and Sunoco Logistics each hold a 30% interest in the entity and Sunoco Logistics will be the operator of the system.

- As of March 31, 2016, ETP's $3.75 billion credit facility had $4 million of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 4.27x.

- In the first quarter of 2016, ETP issued 11.2 million common units through its at-the-market equity program, generating net proceeds of $324 million.

27.    In addition, the Partnership reported Distributable Cash Flow, as adjusted, for the three months ended March 31, 2016 of $349 million, compared to $321 million for the three months ended March 31, 2015, an increase of $28 million.  Adjusted EBITDA for the first quarter 2016 totaled $1.41 billion, an increase of $46 million compared to the first quarter 2015.

28.    On July 28, 2016, the Partnership announced a quarterly distribution to unitholders of $1.055 per ETP common unit for the quarter ended June 30, 2016.  Shortly thereafter, on August 2, 2016, the Partnership issued a press release announcing the successful completion of the project-level financing of the Dakota Access Pipeline ("DAPL") and Entergy Transfer Crude Oil Pipeline ("ETCOP") projects (together, the "Bakken Pipeline").  The Bakken Pipeline is a $2.5 billion facility and "is anticipated to provide substantially all of the remaining capital necessary to complete the projects."

29.     Continuing with its optimist reporting, on August 3, 2015, the Partnership reported successful financial results for the second quarter ended June 30, 2016.  The following "recent key accomplishments" were reported:

- In light of ETP's current common unit price and its resultant cost of capital, Energy Transfer Equity, L.P. ("ETE") has agreed to a reduction in incentive distributions from ETP in the aggregate amount of $720 million over a period of seven quarters, beginning with the quarter ended June 30, 2016 through the quarter ending December 31, 2017.  The quarterly incentive distribution reduction for the quarter ended June 30, 2016 was $75 million, and incentive distribution reductions will increase each subsequent quarter, reaching $130 million for the quarter ending December 31, 2017. Through these incentive distribution reductions, ETE is providing support for ETP during its current major capital spending related to new projects. As these projects are completed, ETP is expected to receive significant cash flow from these projects which, in turn, is expected to facilitate cash distribution growth related to ETP's common units as well as growth in future incentive distributions to ETE.

- In August 2016, ETP, Sunoco Logistics Partners L.P. ("Sunoco Logistics") and Phillips 66 announced the completion of the project-level financing of the Dakota Access Pipeline and Energy Transfer Crude Oil Pipeline projects (collectively the "Bakken Pipeline"). The $2.50 billion facility is anticipated to provide substantially all of the remaining capital necessary to complete the projects.

- In August 2016, ETP and Sunoco Logistics announced they have signed an agreement to sell 36.75% of the Bakken Pipeline project to MarEn Bakken Company LLC, an entity jointly owned by Enbridge Energy Partners, L.P. and Marathon Petroleum Corporation, for $2.00 billion in cash. The sale is expected to close in the third quarter of 2016, subject to certain closing conditions. ETP and Sunoco Logistics will receive $1.20 billion and $800 million in cash at closing, respectively, and will own a combined 38.25% of the Bakken Pipeline project.

- As of June 30, 2016, ETP's $3.75 billion credit facility had $1.13 billion of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 4.47x.

30.     On October 25, 2016, the Partnership announced it was acquiring certain interests in PennTex Midstream Partners, L.P. ("PTXP") for a total consideration of $640 million.  PTXP owns midstream assets strategically located in the Terryville Complex in northern Louisiana that consist of a rich natural gas gathering system, two cryogenic natural gas processing plants totaling 400 million cubic feet per day of capacity, along with residue gas and natural gas liquids (NGLs) pipelines. The Press Release stated that "These assets complement ETP's existing midstream footprint in the region and position ETP for significant growth and value creation."

31.     ETP distributed a quarterly cash distribution of $1.055 per ETP common unit to be paid on November 18, 2016.

32.     More recently, on November 9, 2016 ETP once again reported positive third quarter financial results. Among others, the Partnership's key developments included:

- In October 2016, ETE announced a $0.285 distribution per ETE common unit for the quarter ended September 30, 2016, or $1.14 per unit on an annualized basis.

- As of September 30, 2016, ETE's $1.5 billion revolving credit facility had $885 million of outstanding borrowings and its leverage ratio, as defined by the credit agreement, was 3.08x.

***The Flawed Sales Process***

33.     Despite ETP's recent success, the Partnership opted to sell ETP for an inadequate price and based on a single-bidder process with no market check.

34.     Specifically, in early October 2016, ETP, ETE and SXL met to prepare for their semi-annual meeting and review information related to current and projected financial performance.  Shortly thereafter, on October 19, 2016, ETE management, the ETP Board, and the board of directors of LE GP, LLC, the general partner of ETE (the "ETE Board") met to discuss

8

the possibility of a merger of ETP and SXL.  The financial projections reviewed shortly before reaching this determination, however, are not fully disclosed to unitholders.

35.     Immediately thereafter, ETP hired legal counsel to advise the Board in a potential transaction with SXL and, on October 31, 2016, ETP and SXL met to discuss a potential merger between the two companies.

36.     On November 1, 2016, the ETP Board and the ETE Board held a meeting to discuss ETP management's analysis related to the potential merger.  At this time, the Board determined any transaction would be subject to the ETP Conflicts Committee's approval and appointed Defendants Skidmore and Grimm to the committee.  According to the Registration Statement, the ETP Conflicts Committee was provided the authority to: (i) review and evaluate the proposed transaction, (ii) negotiate the terms and conditions of the proposed transaction and (iii) determine whether to approve the proposed transaction and to recommend approval of the proposed transaction to the ETP Board.

37.     On November 4, 2016, the Board determined to explore Barclays Capital Inc. ("Barclays") as its financial advisor. Barclays had previously served as a financial advisor to ETP in connection with the merger transaction between ETP and Regency Energy Partner's LP. Ultimately, on November 5, 2016, the Board engaged Barclays.  Despite the fact the Registration Statement states that ETP requested that Barclays provide it with an internal conflicts and independence review results, the Registration Statement fails to state precisely if or how any conflicts between Barclays and SXL or ETP were addressed. In fact, as reported by Bloomberg, Barclays is heavily invested in SXL and is the 19th (out of 387) largest holder of SXL units, with a position equal to approximately 1.07% of the outstanding units, larger than all SXL insider holdings combined. In contrast Barclays is the 34th (out of 679) largest holder of ETP units, holding

approximately 0.31% of the outstanding units, nearly 50% more than all ETP insiders combined.

Further, Barclays is the 30th (out of 462) largest holder of ETE units, holding approximately 0.25%

of the outstanding units, more than the majority of ETE's insiders' holdings.  In other words,

Barclays stand to profit from the inadequate merger consideration due to the fact it owns

substantially more holdings in SXL.  None of this is disclosed to unitholders.

38.     On November 10, 2016, ETP furnished Barclays with a financial model for

purposes of Barclays' analysis.  It is unknown exactly what information was provided to Barclays

at this time.

39.     The next day, November 11, 2016, Defendant Warren sent a letter to the SXL Board

indicating that "it would be advisable for SXL to consider making a proposal to acquire ETP in an

all equity transaction in which the equity exchange ratio would be based on a volume weighted

average price for the common units of each of SXL and ETP, with an appropriate premium being

offered to the ETP common unitholders based on SXL's analysis."  The Registration Statement

further explains that this letter:

> indicated that, as SXL would be the acquiring entity in this
> transaction, the existing structure of incentive distribution rights in
> SXL embedded in the current SXL partnership agreement would
> continue following the closing of the transaction. The letter also
> indicated that ETE would evaluate and assist with any transaction
> that SXL would consider proposing to ETP and, in light of ETE's
> various rights under the partnership agreements and limited liability
> company agreements related to the general partners of each of SXL
> and ETP, ETE would be prepared to take appropriate action to
> consent to a transaction between SXL and ETP that ETE determines
> is beneficial to the unitholders of ETE. Following the delivery of
> this letter, Mr. Mason had telephonic conversations with Mr.
> Hennigan, and a representative of RLF to clarify that, based on this
> transaction structure, the then-existing SXL incentive distribution
> subsidies would continue following the closing of the proposed
> transaction but that, due to the extinguishment of the incentive
> distribution rights in ETP in connection with ETP being merged
> with a subsidiary of SXL pursuant to the proposed transaction

structure, the corresponding ETP incentive distribution subsidies provided for in the ETP partnership agreement would also be extinguished.

40.     A series of meetings were held between ETP and SXL following the receipt of this letter, which included the review of financial projections prepared by SXL and provided to ETP, as well as the review of ETP's financial projections and the assumptions used to calculate those projections.

41.     On November 16, 2016, SXL delivered an initial proposal to the ETP Conflicts Committee to acquire ETP as follows:

> (i) ETP common unitholders would receive a number of SXL common units at an exchange ratio reflecting a 5.0% discount to the spot trading price for the ETP common units, (ii) all non-affiliated holders of SXL common units would receive a one-time special distribution of $2.00 per SXL common unit prior to the closing of the merger, which would be funded through borrowings under SXL's credit facility, (iii) in addition to any required ETP approvals, the transaction would be conditioned on obtaining the approval of holders of a majority of outstanding SXL common units, (iv) ETE would approve additional SXL incentive distribution subsidies in the amount of $125.0 million per quarter for the first four quarters following the closing of the merger and $40.0 million per quarter for the fifth through twelfth quarters following the closing of the merger and (v) all existing ETP incentive distribution subsidies and SXL incentive distribution subsidies currently in place would remain in place following the closing of the merger.

42.     The next day, without hesitation, a draft merger agreement was circulated. According to the Registration Statement, the key issues discussed included: (i) the "no shop" covenant, (ii) the requirement that holders of a majority of outstanding SXL common units vote to approve the transaction, (iii) the restrictions on ETP's and SXL's ability to engage in certain business activities after the execution of the merger agreement and prior to closing, (iv) the representations and warranties given by ETP and SXL and (v) the remedies and termination provisions.

43.     Following discussions on November 18, 2016, ETP delivered a counterproposal to SXL, pursuant to which (i) ETP common unitholders would receive SXL common units at an exchange ratio that would equal a 10% premium to the spot trading price for the ETP common units, (ii) SXL would not make a one-time special cash distribution to the SXL unitholders prior to the closing of the transaction, (iii) no SXL unitholder vote would be required to approve the transaction and (iv) all existing ETP incentive distribution subsidies and SXL incentive distribution subsidies would remain in place following the closing of the merger.

44.     SXL responded with a revised proposal where ETP common unitholders would receive 1.475 SXL common units for each ETP common unit and that all ETP incentive distribution subsidies and SXL incentive distribution subsidies would remain in place following the close of the merger.

45.     In response, ETP proposed that ETP common unitholders would receive 1.50 SXL common units for each ETP common unit.  After further discussions and negotiations, an exchange ratio of 1.500 SXL common units per ETP common unit was agreed upon and approved by the Board.  ETP and SXL agreed to a "no shop" covenant despite the lack of a market check and a 3.5% termination fee and the Merger Agreement was executed on November 20, 2016.

**The Inadequate Merger Consideration**

46.     On November 21, 2016, ETP and SXL issued a joint press release announcing the Proposed Transaction.  The press release stated, in relevant part:

> **Sunoco Logistics Partners L.P. (NYSE: SXL) and Energy Transfer Partners, L.P. (NYSE: ETP)** today announced that they have entered into a merger agreement providing for the acquisition of ETP by SXL in a unit-for-unit transaction. The transaction was approved by the boards of directors and conflicts committees of both partnerships and is expected to close in the first quarter of 2017, subject to receipt of ETP unitholder approval and other customary closing conditions.

Under the terms of the transaction, ETP unitholders will receive 1.5 common units of SXL for each common unit of ETP they own. This equates to a 10% premium to the volume weighted average pricing of ETP's common units for the last 30 trading days immediately prior to the announcement of the transaction.

As SXL will be the acquiring entity, the existing incentive distribution rights provisions in the SXL partnership agreement will continue to be in effect, and Energy Transfer Equity, L.P. (NYSE: ETE) will own the incentive distribution rights of SXL following the closing of the transaction. As part of this transaction, ETE has agreed to continue to provide all the incentive distribution right subsidies that are currently in effect with respect to both partnerships. The transaction is expected to be immediately accretive to SXL's distributable cash flow per common unit and is also expected to allow the combined partnership to be in position to achieve near-term distribution increases in the low double digits and a more than 1.0x distribution coverage ratio.

The transaction is expected to provide significant benefits for SXL and ETP unitholders as the combined partnership will have increased scale and diversification across multiple producing basins and will have greater opportunities to more closely integrate SXL's natural gas liquids business with ETP's natural gas gathering, processing and transportation business. With this transaction, SXL and ETP expect to build upon their experience working together as partners in several joint ventures to pursue commercial opportunities and to achieve cost savings while enhancing the service capabilities for their customers. SXL and ETP expect that the transaction will allow for commercial synergies and costs savings in excess of $200 million annually by 2019.

The transaction is also expected to strengthen the balance sheet of the combined organization by utilizing cash distribution savings to reduce debt and to fund a portion of the growth capital expenditure programs of the two partnerships. ETP and SXL have spent approximately $15 billion in organic growth capital over the past several years, and these expenditures, combined with the completion of other major capital projects currently in progress, are expected to continue to generate strong distributable cash flow growth.

Both ETP and SXL management teams are pleased to be able to bring two strong partnerships together in this strategic transaction that combines the premier crude oil midstream MLP with the premier natural gas midstream MLP. The combined partnership is expected to be the second largest MLP as measured by enterprise value.

At the closing of the transaction, the Chief Executive Officer, Chief Commercial Officer, President and Chief Financial Officer of the combined partnership will be Kelcy Warren, Mackie McCrea, Matt Ramsey and Tom Long, respectively, and it is expected that Mike Hennigan and other members of the SXL management team

will continue in leading management roles of the combined company with the SXL business headquartered in Philadelphia.

SXL and ETP will hold a joint conference call to discuss the transaction details on Monday, November 21, 2016 at 3:00 p.m. Central Time (4:00 p.m. Eastern Time). An investor presentation will be posted to the partnerships' websites and filed with the SEC on a Form 8-K.

The dial-in number for the call is 1-877-524-8416. The investor presentation and a live webcast of the call may be accessed on the investor relations page of SXL's website at www.sunocologistics.com or ETP's website at www.energytransfer.com. The call will be available for replay on those sites or by dialing 1-877-660-6853. A replay of the broadcast will also be available on SXL's and ETP's websites for a limited time.

Advisors

Latham & Watkins LLP acted as legal counsel to ETP. Vinson & Elkins LLP acted as legal counsel to SXL. Barclays acted as financial advisor and Potter Anderson & Corroon LLP acted as legal counsel to ETP's conflicts committee. Citi acted as financial advisor and Richards Layton & Finger, P.A. acted as legal counsel to SXL's conflicts committee.

47.     Following this announcement, on December 16, 2016, ETP approved and adopted Amendment No. 1 to the Merger Agreement.

48.     The inadequate merger consideration ultimately agreed to is a reflection of the single bidder process that lacked any market check whatsoever.  In fact, the inadequate merger consideration is evident by the series of news articles published following the announcement of the Proposed Transaction, all of which recognize that ETP unitholders are getting the short end of the stick.

49.     For example, a November 22, 2016, Bloomberg article entitled "Energy Transfer and the Art of Transference," stated that ETP unitholders will get a "stealth dividend cut," and the potential synergies do not offset this upfront cut. In pertinent part, the article stated::

*So ordinary investors in Energy Transfer Partners will get a stealth dividend cut instead.* They will receive 1.5 units of Sunoco Logistics Partners for every unit they own. Sunoco Logistics Partners' quarterly dividend is just 51 cents per unit.

14

Multiply that by 1.5, and Energy Transfer Partners' investors will see their quarterly payout drop from $1.06 to 77 cents -- a cut of 27 percent. Ouch.

\*        \*        \*

This ticks a number of boxes. At the level of the underlying partnerships, it saves about $630 million a year of precious cash -- roughly equivalent to the entire annual distributions to common investors that Sunoco Logistics Partners pays now.

Meanwhile, having reset the dividend lower, the Energy Transfer group can more credibly sell a growth story to investors from here.

\*        \*        \*

This is backed up by the promise of synergies to offset their pain; $200 million a year by 2019 in this case. Here are three reasons why investors may roll their eyes at this:

First, recall that, during the twisty-turny phase of the Williams saga, Energy Transfer took the bold (Pythonesque?) step of trashing its own synergies estimates. (I'm guessing these latest ones will stand, though).

***Second, even taken at face value, those synergies, discounted at 10 percent and assuming $100 million of upfront costs, are worth perhaps $2 per Energy Transfer Partners unit in today's money. That isn't much compensation, given the upfront $1.16 cut to annual dividends, which is much more tangible.***

Third, more philosophically, if this sort of deal is required to reap synergies from the various bits of the Energy Transfer group, then what exactly is the benefit of the Energy Transfer group?

72.     On November 21, 2016, the NY Times published an article entitled "Market Reaction to Deal May Bode Ill for Energy Transfer Partners," noting the negative impact of the Proposed Transaction:

The initial reaction does not look promising. Shares of Sunoco and Energy Transfer Partners fell nearly 10 percent on Monday shortly after the opening bell, pushing the value of the deal below $20 billion, before recovering some of their losses. Shares of Energy Transfer Equity rose more than 3 percent, suggesting its shareholders may benefit the most from all the deck chair shuffling. With the Energy Transfer Equity-Williams debacle fresh in investors' minds, the market's reaction looks like a bad omen.

73.     The negative reviews continued when, on December 5, 2016, Seeking Alpha published an article, entitled "Energy Transfer Partners' Merger Gives You Multiple Trades To Do," which discussed the debt problems related to the transaction:

> It's not just SXL and ETP unitholders that are affected by this transaction. The combined partnership will be assuming ETP's $30.5 billion outstanding total debt. Adding SXL's own $6.0 billion total debt, investors will be looking at an entity with $36.5 billion debt versus $5.6 billion Annualized Adjusted EBITDA, which equates to 6.5x leverage before synergies.

50.     Indeed, according to a November 21, 2016 article published by Forbes, entitled "Is There Value In Sunoco Logistics' Merger With Energy Transfer Partners," "[t]he deal, which consists of all stock, looks cheap, valuing ETP at $39.29 per unit, slightly lower than its $39.37 closing price this past Friday (the entities say the price represents a 10% premium over the target's average closing price over the last 30 days)."

51.     In fact, Bloomberg, analysts' consensus estimate for ETP is $43.81 per unit and at least one analyst following the Partnership has set a price target of $55 per unit.

52.     The low merger consideration is furthermore not surprising given that Barclays "did not ascribe a specific range of values to the ETP common units or the SXL common units but rather made its determination to a fairness, from a financial point of view, to unaffiliated ETP unitholders of the exchange ratio to be offered to such unaffiliated ETP unitholders in the proposed transaction on the basis of various financial and comparative analyses."

53.     While Barclays did not ascribe a specific value, its own analyses indicate that ETP unitholders are not receiving adequate consideration.  For instance, according to Barclay's *Discounted Distributable Cash Flow Analysis*, ETP common units are worth as much as $46 per unit (even based on the assumption that ETP distributions would be reduced during the projection period), or approximately 17% more than the implied value of the consideration in the Proposed

Transaction. Indeed, the implied value of the Proposed Consideration is less than the low end of the implied valuation range for ETP units derived from the *Discounted Distributable Cash Flow Analysis*.

54.     Similarly, according Barclays' *Selected Comparable Company Analysis,* ETP common units are worth as much as $45 per unit, or approximately 15% more than the implied value of the consideration in the Proposed Transaction.

55.     Furthermore, the Registration Statement also makes clear that the ETP Conflicts Committee was "not authorized to, and did not, conduct an auction process or other solicitation of interest from third parties."  The Registration Statement explains that "[g]iven ETE's control over ETP's general partner, it was unrealistic to expect or pursue an unsolicited third party acquisition proposal or offer for the assets or control of ETP, and it was unlikely that the ETP Conflicts Committee could conduct a meaningful auction for the acquisition of the assets or control of ETP."

56.     Thus, it is evident that the inadequate consideration is a result of a conflicted and inadequate process that looked to benefit SXL to the detriment of ETP unitholders.

***The Preclusive Deal Protection Devices***

57.     The Merger Agreement also contains certain provisions that unduly benefit SXL by making an alternative transaction either prohibitively expensive or otherwise impossible. Significantly, the Merger Agreement contains a termination fee provision that requires ETP to pay $630 million to SXL if the Merger Agreement is terminated under certain circumstances. .

58.     The Merger Agreement also contains a "No Solicitation" provision that restricts ETP from considering alternative acquisition proposals by, inter alia, constraining ETP's ability to solicit or communicate with potential acquirers or consider their proposals.  Specifically, the

provision prohibits the Partnership from directly or indirectly soliciting, initiating, proposing or inducing any alternative proposal.

59.     Further, the Merger Agreement grants SXL matching rights, including the right to be provided with confidential, non-public information concerning any competing acquisition proposal from a third party and the right to be provided with any non-public information or data provided to a possible competing bidder that was not previously made available to SXL, which information SXL then could use to prepare a matching bid. In the event of a superior offer, the Merger Agreement also automatically gives SXL several business days to renegotiate the terms of the Proposed Transaction.

60.     The Proposed Transaction is also subject to approval by a majority of the ETP common units and Series A units, voting together as a single class, which will include the ETP units held by ETE and its affiliates, including SXL.  Despite this conflict, there is no requirement of a separate approval by a majority of the unaffiliated ETP unitholders.

61.     Accordingly, the Partnership's true value is compromised by the consideration offered in the Proposed Transaction and the Proposed Transaction is the product of the Board's breaches of fiduciary duty.

***The Proposed Transaction is Rife with Conflicts of Interest***

62.     The Proposed Transaction is the result of a conflicted process led by conflicted members of ETP and Barclays.

63.     First, ETE has economic interests that differ from those of ETP's unitholders by virtue of its ownership of the general partner and incentive distribution rights in SXL.  Specifically, ETP and SXL are intertwined by virtue of their ETP and ETE holdings. ETE holds a controlling ownership interest in ETP and controls ETP through ETE's ownership of ETP GP LLC, which is

the general partner of ETP GP. ETE also owns all of the limited partner interests of ETP GP and

ETP GP owns 100% of the general partner interest and incentive distribution rights in ETP and all

of the Class J units in ETP. ETE also owns all of the Class H units and Class I units in ETP, as

well as approximately 0.5% of the outstanding ETP common units. In addition, ETE indirectly

owns a 0.1% membership interest in SXL GP, which owns 100% of the general partner interest

and incentive distribution rights in SXL.

64.     Further, ETP owns the general partner, 100% of the incentive distribution rights,

and 67.1 million common units of SXL. ETP's general partner is owned by ETE. ETE is a master

limited partnership that owns the general partner and 100% of the incentive distribution rights

(IDRs) of ETP and Sunoco LP. ETE also owns approximately 2.6 million ETP common units and

approximately 81.0 million ETP Class H Units, which track 90% of the underlying economics of

the general partner interest and IDRs of SXL.

65.     In addition, the ETP Board has conflicts of interest based upon their entanglement

with SXL.  Specifically, Defendant Warren is CEO and Chairman of the Board at ETP GP, as well

as the Chairman of the Board of ETE GP. Defendant McCrea is a Director at ETP GP, Chairman

of the Board at SXL GP, and COO and Chief Commercial Officer and a Director at ETE GP.

Defendant Perry is a Director at ETP GP and a Director at SXL GP. Defendant Ramsey is the

President, Chief Operating Officer and Director at ETP GP and a Director at ETE GP.

66.     The ETP officers and directors are also conflicted by virtue of their continuing

employment positions after the Proposed Transaction is consummated.  Following the

consummation of the Proposed Transaction, Defendant Warren will be the CEO of SXL.

Defendant McCrea will become the Chief Commercial Officer and Defendant Ramsey will

become the President of SXL.  ETP's current board members are further expected to serve as members of the board of the combined company.

67.     The ETP officers and directors are further conflicted and expected to receive significant financial windfalls as the result of the Proposed Transaction. Under the Merger Agreement, each ETP restricted unit held by ETP's directors and executive officers that is outstanding as of immediately prior to the effective time will cease to relate to or represent a right to receive ETP common units and will be converted, at the effective time, into the right to receive an award of restricted units relating to SXL common units on the same terms and conditions as were applicable to the corresponding award of ETP restricted units, except that the number of SXL common units covered by the award will be equal to the number of ETP common units covered by the corresponding award of ETP restricted units multiplied by the exchange ratio, rounded up to the nearest whole unit.  ETP's executive officers and directors hold the following ETP restricted units:

| Name of Executive Officer | Number of Outstanding ETP Restricted Units |
|---|---|
| Kelcy L. Warren | — |
| Marshall S. (Mackie) McCrea, III | 227,240 |
| Matthew S. Ramsey | 77,190 |
| Thomas E. Long | 40,644 |
| James M. Wright | 29,084 |
| A. Troy Sturrock | 14,727 |

| Name of Director | Number of Outstanding ETP Restricted Units |
|---|---|
| Ted Collins, Jr. | 6,600 |
| Michael K. Grimm | 6,600 |
| James R. (Rick) Perry | 5,358 |
| David K. Skidmore | 7,176 |

68.     Accordingly, the interests of ETP's officers and directors are not aligned with ETP's unitholders, resulting in inadequate consideration for ETP unitholders.

***The Materially Misleading Registration Statement***

69.     On December 20. 2016, Defendants filed the Registration Statement with the SEC. The Registration Statement fails to disclose or contains misleading disclosures regarding the background of the Proposed Transaction, management's financial projections and Barclays' analyses.

70.     With respect to management's financial projections, the Registration Statement fails to disclose: (i) the projected revenues, incomes, net income and expenses; (ii) the basis for ETP's assumption that it would likely have to reduce its distribution during the projection period despite the fact the Company had steadily increased its distributions over the past few years; (iii) a GAAP reconciliation of the derived non-GAAP metrics included in the Registration Statement; (iv) the schedule of the incentive distribution subsidies provided by, and projected to be provided by, ETE to each of ETP and SXL; and (v) the certain estimates provided by ETP to Barclays as to the amounts and timing of the cost savings and revenue enhancements anticipated by the management of ETP to result from the proposed transaction.

71.     With respect to Barclay's analyses, the Registration Statement fails to disclose the projected value of the pose-Merger partnership units or indicate how much of that value will be contributed by ETP and SXL.

72.     With respect to Barclay's *Pro Forma Merger Consequences Analysis*, the Registration Statement fails to disclose: (i) that the analysis implies an exchange ratio of approximately 1.54 to 1.94 SXL units per ETP unit based on the Status Quo Case; (ii) how the implied exchange ratio from this analysis differs so greatly from that derived from the Discounted Distributable Cash Flow Analysis (which also analyzed the projected distributable cash flow per unit); (iii) the discounted cash flow figures used in the analysis; how they differed from the distributable cash flow projections; how the discounted cash flow figures were calculated; the

inputs and assumptions for that calculation; and, whether they were based on (undisclosed) management cash flow projections; and (vi) the projected value of the post-Merger partnership units, and relative contributions to such value by ETP and SXL.

73.     With respect to Barclays' *Discounted Distributable Cash Flow Analysis*, the Registration Statement fails to disclose: (i) the basis for two hypothetical reductions in ETP distributions; (ii) the projected cost of equity for ETP and SXL; (iii) the specific discount rates applied to the ETP Status Quo Case and ETP Distribution Reduction Case; (iv) whether the discount rates were applied to both the estimated distributable cash flows and the terminal values, or just the cash flows; and (v) the net present value "as of" date used for ETP; and whether it was other than January 1, 2017, as noted with respect to SXL.

74.     With respect to Barclays' *Selected Comparable Company Analysis*, the Registration Statement fails to disclose the individually observed metrics and multiples, including the estimated yields for each of the analyzed companies.

75.     With respect to Barclays' *Selected Precedent Transactions Analysis*, the Registration Statement fails to disclose: (i) the basis for including a nearly 20 year old transaction; (ii) the basis for including five transactions (nearly a third of all analyzed) that occurred during or prior to the financial collapse; (iii) in light of the inclusion of such stale and irrelevant transactions, the individually observed metrics and multiples so unitholders can fairly compare the Proposed Transaction to others that were consummated in a comparable economic climate; and (iv) the certain "qualitative judgments [by Barclays] concerning differences between the characteristics of the selected precedent transactions and the proposed transaction which would affect the acquisition values of the selected target companies and ETP and SXL."

76.     With respect to Barclays' *Analysis of Equity Research Analyst Price Targets*, the Registration Statement fails to disclose: (i) the source of the analyst price targets (given that the data appears inconsistent with that available on Bloomberg); and (ii) the dates the price targets were issued, or at least, the earliest date of a target included in the analysis.

## CLASS ACTION ALLEGATIONS

77.     Plaintiff brings this action as a class action individually and on behalf of all holders of ETP common units who are being and will be harmed by the Individual Defendants' actions, described herein (the "Class"). Excluded from the Class are Defendants and any person, firm, trust, corporation or other entity related to or affiliated with any Defendant.

78.     This action is properly maintainable as a class action.

79.     The Class is so numerous that joinder of all members is impracticable. As of December 28, 2016, there were over 544.57 million common units of ETP outstanding, resulting in hundreds, if not thousands of unitholders.

80.     There are questions of law and fact which are common to the Class including, inter alia, the following:

    a.    Whether Defendants violated Sections 14(a) and 20(a) of the Exchange Act in connection with the Proposed Transaction;

    b.    Whether Defendants have failed to engage in a fair process and obtain the best price available for the benefit of Plaintiff and the other members of the Class in connection with the Proposed Transaction;

    c.    Whether the Class is entitled to injunctive relief or damages as a result of the wrongful conduct committed by the Defendants; and

      d.   Whether Defendants have disclosed and will disclose all material facts in connection with the Proposed Transaction; and

81.    Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff has the same interests as the other members of the Class. Accordingly, Plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

82.    The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

83.    Defendants have acted, or refused to act, on grounds generally applicable to, and causing injury to the Class and, therefore, preliminary and final injunctive relief on behalf of the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

## <u>COUNT I</u>

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of
Section 14(a) of the Exchange Act and Rule 14a-9**

84.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

85.    Defendants have filed the Registration Statement with the SEC with the intention of soliciting ETP unitholder support for the Proposed Transaction. Each of the Individual

Defendants reviewed and authorized the dissemination of the Registration Statement, which fails to provide the material information referenced above.

86.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of ETP, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

87.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with unitholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

88.     Specifically, and as detailed above, the Registration Statement violates Section 14(a) and Rule 14a-9 because it omits material facts concerning the value of ETP shares and the financial analyses performed by Barclays in support of its fairness opinion.

89.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Registration Statement is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.  The Individual Defendants knew or should have known that the material information identified above has been omitted from the Registration Statement, rendering the sections of the Registration Statement identified above to be materially incomplete and misleading.

90.    The misrepresentations and omissions in the Registration Statement are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction. Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

91.    Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

92.    The Individual Defendants acted as controlling persons of ETP within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as officers and/or directors of ETP and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Registration Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

93.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Registration Statement and other statements alleged by Plaintiff to be misleading prior to the time the Registration Statement was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

94.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same.  The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction.  The Registration Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction.  They were, thus, directly involved in the making of the Registration Statement.

95.     In addition, as the Registration Statement sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement.  The Registration Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered.  The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

96.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

97.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

98.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in his favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.      Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representative and his counsel as Class Counsel;

B.      Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Registration Statement;

C.      Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

D.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

E.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: January 11, 2017                    **THE KENDALL LAW GROUP, PLLC**

_____

Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
Jamie J. McKey
Texas Bar No. 24045262
jmckey@kendalllawgroup.com
3232 McKinney Avenue, Suite 700
Dallas, TX 75204
Telephone: (214) 744-3000
Facsimile:  (214) 744-3015

**LEVI & KORSINSKY LLP**
Shane T. Rowley
srowley@zlk.com
733 Summer Street, Suite 304
Stamford, CT 06901
Tel: (212) 363-7500
Fax: (212) 363-7171

*Attorneys for Plaintiff*